Receipt number AUSFCC-8905257

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST**

| | |
|---|---|
| **SLS FEDERAL SERVICES, LLC**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA**<br><br>        **Defendant.** | **Case No.** ___23-1240 C___<br><br>**Judge** _____ |

**COMPLAINT**

1.      SLS Federal Services, LLC ("SLS-FS") protests the actions of the U.S. Department of the Navy ("Navy"), Naval Facilities Engineering Systems Command ("NAVFAC") in connection with Amendment 7 to Solicitation No. N62470-20-R-5003 ("Amendment 7" or the "Amendment"), *see* Exhibit ("Ex.") 1, for Global Contingency Construction ("GCC").  The original RFP for Solicitation No. N62470-20-R-5003 ("RFP") is attached as Ex. 2.

2.      Through Amendment 7, NAVFAC is refusing to proceed with a permissible proposal evaluation scheme, in violation of the law as well as a prior injunction issued by this Court.  In January of this year, this Court held that—for this RFP in particular—NAVFAC must use a "price analysis" to evaluate offers. *SLS Fed. Servs., LLC v. United States*, 163 Fed. Cl. 596, 602 (2023).  This Court also explained that the "agency does not perform a price analysis when it evaluates the separate cost elements and ignores price." *Id.*  This Court ordered that, if NAVFAC were to move forward with the RFP (as it is now doing), it must "do so in a manner consistent with this opinion." *Id.* at 608.  However, NAVFAC is not following this Court's order, and it is not complying with applicable procurement laws for this multi-billion-dollar procurement for construction.

3.       Congress has directed that Department of Defense ("DoD") contracts for construction must not be procured as cost reimbursement contracts. *See* 10 U.S.C. § 3323. Here, while Amendment 7 pays lip service to the terminology of firm-fixed-price ("FFP") contracting, NAVFAC has again declined to evaluate prices for this part of the work. It is instead using an obvious cost evaluation scheme—again choosing to evaluate labor rates, indirect rates, and profit rates for FFP work. Regardless of NAVFAC's label, however, these are cost elements that cannot be used as a basis for a "price analysis." Under NAVFAC's planned approach to the RFP, it will again fail to conduct the required price analysis and is not in compliance with this Court's order.

4.       The Federal Acquisition Regulation ("FAR")[1] defines a FFP contract as follows: "A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties." FAR 16.202-1.

5.       The FAR explains that when analyzing a contract price, the government should generally do so "without evaluating its separate cost elements and proposed profit." FAR 15.404-1(b)(1). Instead, the preferred method for reviewing the reasonableness of a proposed FFP is by comparing prices received in response to a solicitation: "Normally, adequate price competition establishes a fair and reasonable price." FAR 15.404-1(b)(2)(i). *See also* FAR 15.404-1(b)(3) ("The first two techniques at 15.404-1(b)(2) [adequate price competition and comparison to historical prices] are the preferred techniques.").

---

[1] The FAR and the Defense Federal Acquisition Regulation Supplement ("DFARS") are included in Title 48 of the Code of Federal Regulations. For ease of reference, the Complaint uses "FAR" or "DFARS" in reference to sections of this Title.

6.      While the RFP purports to be contemplating award of billions of dollars for FFP construction work, NAVFAC's Amendments 6 and 7 propose to make this award without requesting any actual construction prices from the offerors.

7.      An RFP that does not request prices cannot be used to award contracts for FFP work. Such an RFP for major construction work is improper for a plethora of reasons, including:

      a.  it is an attempt to award a contract on a basis other than FFP, such as a cost reimbursement basis, in violation of 10 U.S.C. § 3323;

      b.  it fails to consider price in NAVFAC's best-value determination, in violation of the Competition in Contracting Act ("CICA"), 10 U.S.C. § 3206(c)(1)(B);

      c.  it is an attempt to delay the consideration of price until the award of the actual task orders, in violation of CICA, 10 U.S.C. § 3206(c)(1)(B);

      d.  it is arbitrary, capricious, and in violation of multiple provisions of the FAR that require agencies to review prices in a manner relevant to and rational for the procurement being performed. *See* 28 U.S.C. § 1491(b)(4) (incorporating by reference 5 U.S.C. § 706).

8.      In fact, NAVFAC's latest approach to this procurement appears to improperly default, in multiple instances, to cost reimbursement standards of contracting and an evaluation of costs—not prices. For example, Amendment 7 requires offerors to provide indirect rates that will be applied against subcontractor costs, as well as profit margins that will purportedly apply to the labor provided by the offerors for NAVFAC to evaluate in the course of its award decision for FFP construction work.

9.    Similarly, Amendment 7 requires offerors to provide labor rates as the primary method of evaluating fixed price contracts, even though labor rates for construction work are merely cost elements that are a fraction of the price that the government will ultimately pay for a construction project—in this context labor rates are not prices.  Such individual cost information is not necessary, is in fact discouraged by the FAR—particularly where adequate competition already exists—and violates this Court's prior order regarding this procurement.  NAVFAC's default to cost reimbursement concepts is wholly inconsistent with FFP contracting.

10.    NAVFAC has recently issued Amendment 8 to the RFP, extending the deadline to file proposals and indicating that additional amendments are coming.  *See* Ex. 5, Amendment 8 to Solicitation No. N62470-20-R-5003 ("Amendment 8").

11.    Amendment 8, however, does not specify when a new amendment will be forthcoming, and leaves the RFP otherwise unchanged, including Amendments 6 and 7. Amendments 6 and 7, as described in detail below, have essentially proposed to maintain a cost-reimbursement evaluation in lieu of a price evaluation.  Indeed, after receiving questions, NAVFAC has proposed to remove price entirely from the best value determination.  SLS-FS has no reason to believe that any additional amendments will change the fundamental problems with the current RFP.

## PARTIES

12.    Plaintiff SLS-FS is a corporation organized under the laws of Texas with its principal offices located at 6702 Broadway, Galveston, TX 77550.

13.    Defendant is the United States of America, acting by and through NAVFAC, an agency of the United States government.  NAVFAC issued the RFP at issue and violated federal acquisition law in connection with this procurement.  The Contracting Officer responsible for this procurement is Linda C. Stein and the Contract Specialist is Amber L. Forehand-Hughes.

## JURISDICTION

14.    Jurisdiction in this Court is proper under 28 U.S.C. § 1491(b).  SLS-FS alleges that an Executive Department of the United States Government acted in a manner that is arbitrary, capricious, and in violation of one or more statutes or regulations governing this procurement including 10 U.S.C. § 3201, 10 U.S.C. § 3206(c)(1), 10 U.S.C. § 3206(c)(3), 10 U.S.C. § 3322(a), 10 U.S.C. § 3323, FAR 5.203(c), FAR 15.101, FAR 15.304(c)(1)(i), FAR 15.308, FAR 15.403-1, FAR 15.404-1, and FAR 16.206-3.

15.    The Court of Federal Claims ("COFC") has exclusive jurisdiction over objections to "a solicitation by a Federal agency for bids or proposals for a proposed contract."  28 U.S.C. § 1491(b)(1).

16.    SLS-FS is an "interested party" under 31 U.S.C. § 3551(2)(A) because it is an actual offeror that submitted an offer in response to the RFP and a prospective offeror that will submit an offer in response to the RFP as amended.  SLS-FS's direct economic interest is affected by NAVFAC's failure to follow applicable law and regulation in Amendments 6 and 7.

## FACTUAL BACKGROUND

### A.    Prior History

17.    This is not the first time SLS-FS has protested NAVFAC's illegal actions with respect to this RFP.  In August 2021, SLS-FS protested at the Government Accountability Office ("GAO") the initial award of contracts N62470-21-D-0018, N62470-21-D-0019, N62470-21-D-0020, N62470-21-D-0021, N62470-21-D-0022, and N62470-21-D-0023 ("Contracts") to Aptim Federal Services, LLC ("Aptim"), CDM, a Joint Venture ("CDM"), ECC Contingency Constructors, LLC ("ECC"), Gilbane Federal ("Gilbane"), Jacobs Project Management Co. ("Jacobs"), and Perini Management Services, Inc. ("Perini"), respectively.

18.     In response to that initial protest, NAVFAC agreed to take corrective action. However, NAVFAC took *over a year* to come back with *the same result*: no awardees had changed and there was only a minor update to the evaluation itself.  Given this insufficient corrective action, SLS-FS protested again, ultimately taking matters to first the GAO and then to this Court for further review.

19.     Based on substantive briefing of all pertinent issues, the Court ruled that the RFP and NAVFAC's evaluation could not stand, and that a *second* corrective action was necessary.

20.     As set forth in detail in this Complaint, the central issue both then and now is how NAVFAC is assessing (or failing to assess) both cost and price.  Amendment 7's new pricing scheme fails to satisfy the issues that SLS-FS challenged both in 2021 and last year and that the COFC found to be improper in its January 2023 opinion.

21.     Based on these and other reasons set forth in this Complaint, SLS-FS respectfully submits that NAVFAC's actions were arbitrary, capricious, and contrary to law.  *See* 28 U.S.C. § 1491(b)(4) (incorporating by reference 5 U.S.C. § 706).

**B.      The Original RFP and Its Evaluation Factors**

22.     NAVFAC initially issued the GCC RFP on August 20, 2020.  The RFP called for the award of multiple Indefinite Delivery/Indefinite Quantity ("IDIQ") contracts for GCC.  The RFP anticipated the award of multiple contracts "for a period not-to-exceed (NTE) eight (8) years" for a maximum dollar value of $5 billion.  *See* RFP at 4.  The RFP stated that awardees would later compete for the award of task orders under the GCC contracts and that the task orders would be awarded on "either Cost-Plus-Award Fee (CPAF) or Firm-Fixed-Price (FFP)" basis.  *Id.*

23.     The RFP stated that "[a]ward will be made to the responsible Offeror(s) whose offer conforms to the solicitation and represents the best value to the Government, cost and non-cost factors considered."  RFP at 125; *see also* RFP at 118 ("The Government intends to award a

contract or contracts resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value after evaluation in accordance with the factors and subfactors in the solicitation.") (incorporating FAR 52.215-1(f)(1)).

24.    The RFP provided for the following non-cost/price evaluation factors for making the required best-value determination: (1) Corporate Experience, (2) Safety, (3) Small Business Utilization and Participation, and (4) Past Performance.  *See* RFP at 125.  As to their relative weight, the RFP explained that Past Performance was the most significant of the non-price evaluation factors.

25.    However, the RFP went on to explain that cost was the single most important evaluation factor:  "When the proposal is evaluated as a whole, the technical factors (Factors 1, 2, and 3) and past performance/performance confidence assessment factor (Factor 4) combined (i.e., the non-cost/price evaluation factors) are approximately equal to cost."  *Id.*

26.    The cost proposal was to be evaluated for "completeness, reasonableness, and realism."  RFP at 128.  Specifically, RFP Section M provided that the "Basis for Evaluation" shall be based on four factors:

- Completeness–All information required under Provision L.2 of the solicitation.

- Price reasonableness in accordance with FAR 15.404-1(b).

- Cost reasonableness in accordance with FAR 15.404-1(c).

- Cost realism in accordance with FAR 15.404-1(d).

RFP at 128.

27.    In making those assessments, NAVFAC specifically agreed to review "all information provided as required in Section L of this solicitation" in evaluating cost proposals—specifically including "cost pool information."  *Id.*

**C.    Original Protest and Corrective Action**

28.    On July 15, 2021, NAVFAC announced the original award of the Contracts. In response to the results of the original evaluation, SLS-FS filed the Original GAO Protest on August 10, 2021.  SLS-FS challenged NAVFAC's fundamentally flawed price evaluation and also argued that NAVFAC misevaluated SLS-FS's past performance and failed to conduct required discussions.

29.    NAVFAC then filed a notice with GAO on August 16, 2021, that it would be taking corrective action with respect to its evaluations of the offerors:

> [T]he Agency intends to take corrective action to address the evaluation of the proposals, **including, but not limited to, price reasonableness**. The Agency will take further action as is appropriate in accordance with the Solicitation, the Federal Acquisition Regulations, and all other applicable federal law, document the results of this corrective action, and notify offerors accordingly.

*See* Ex. 3, Notice of Corrective Action (emphasis added).

**D.    Second Protest and Second Corrective Action**

30.    After almost an entire year without any additional engagement with the offerors, NAVFAC finally provided an update on the award process.  On June 27, 2022, NAVFAC announced that the original award of the Contracts would stand.

31.    To be clear, after approximately a year of corrective action—in which NAVFAC made no changes to the RFP, failed to engage in discussions, and requested no additional information from offerors—the end result was that NAVFAC awarded the same six contracts to the same six offerors using virtually identical ratings for the awardees.

32.    On July 25, 2022, SLS-FS submitted a protest at the GAO.  SLS-FS protested that NAVFAC's award was improper for multiple reasons, including that NAVFAC failed to conduct

the required cost/price evaluation that NAVFAC itself agreed to in the original corrective action and in the RFP.

**E.      2022 Court of Federal Claims Lawsuit**

33.      Following a dispute over the scope of the document production before the GAO, SLS-FS filed a bid protest against NAVFAC at the COFC and the GAO dismissed the protest before it.

34.      On January 3, 2023, this Court issued a decision sustaining SLS-FS's protest and enjoining NAVFAC from proceeding with performance of the Contracts.  *See SLS Fed. Servs.*, 163 Fed. Cl. at 607–608.

35.      The Court ruled in SLS-FS's favor on the key issue that NAVFAC's corrective action had failed to "cure the original procurement defect," which was NAVFAC's "improper price reasonableness analysis."  *Id.* at 601.  As the Court concluded, "the agency did not (and could not) analyze price reasonableness under FAR 15.404-1(b)."  *Id.* at 602.

36.      The Court found that NAVFAC had "requested only cost data, like hourly labor rates and indirect ceiling rates," despite NAVFAC committing in the RFP to analyzing offerors' cost proposals "for both cost and price reasonableness."  *Id.* at 600.  This was particularly untenable for the evaluation process detailed in the RFP because "of the two contract-line-item numbers (CLIN), the agency explained that over half of all work would be performed under CLIN 002 as firm fixed price task orders."  *Id.*

37.      Instead of requesting "any price data from the bidders," "the agency requested cost information, such as hourly labor rates, which helped it determine a contractor's reimbursable expenses but not its prices."  *Id.* at 602.  The Court found "the solicitation's structure left the agency without the necessary information to perform a price analysis" and that the "problem then survived the agency's corrective action because the agency never attempted to fill that void."  *Id.*

As the Court directly put it: "[t]he agency could not evaluate price reasonableness without pricing information." *Id*.

38.    While NAVFAC tried to argue otherwise, the Court found that an agency cannot "perform a price analysis when it evaluates the separate cost elements and ignores price. Instead, and as subsection(c)(1) explains, that is called 'cost analysis.'" *Id.*

39.    The Court also responded to NAVFAC's argument "that a price analysis would be impossible" for this solicitation by noting that the Court itself "found other procurements where agencies have evaluated price reasonableness in similar contexts." *Id.* at 603. These examples included "a scheme where the [Army Corps of Engineers] would provide a 'set of estimated quantities for a 'likely emergency event' to take place in that region' and would multiply that by 'the rates proposed by each offeror' to 'arrive at the total evaluated price for each region.'" *Id.* (citing *In re CrowderGulf, LLC*, B-418693.9, 2022 CPD ¶ 90, at *3 (Comp. Gen. Mar. 25, 2022)).

40.    The Court also found in SLS-FS's favor on the argument that NAVFAC violated DFARS 215.306 by failing to conduct discussions. *See id.* at 603–606. Ultimately the Court granted SLS-FS's motion for judgment on the administrative record and enjoined NAVFAC "from proceeding with performance of the contracts awarded to Aptim, CDM, ECC, Gilbane, Jacobs, and Perini." *Id.* at 608.

41.    Most important for this bid protest is the Court's final admonition to NAVFAC: "If the agency moves forward with the solicitation, it will do so in a manner consistent with this opinion." *Id.*

**F.    NAVFAC Issues Amendment 6 and Requests Potential Offerors Questions**

42.    Despite clear directions from the Court on how NAVFAC must proceed with correcting this RFP, NAVFAC waited *six months* before issuing Amendment 6 to the RFP on July 14, 2023. *See* Ex. 4, Amendment 6 to Solicitation No. N62470-20-R-5003. What is plain from

reviewing Amendment 6 is that NAVFAC failed to heed the Court's order, and did not move forward "in a manner consistent with" the Court's opinion.

43.     NAVFAC's stated reason for Amendment 6 is "because it is changing the cost/price evaluation factor and the evaluation of proposals."  Amend. 6 at 1.  Following is a description of the key changes NAVFAC made to the RFP through Amendment 6.

44.     First, NAVFAC changed the evaluation scheme's relative importance of the evaluation factors: "In the tradeoff process, as delineated herein, technical is more important than cost/price." Amend. 6 at 1.  Cost and price will no longer be the most important evaluation factor.

45.     Second, NAVFAC added three additional attachments related to the price evaluation portion of Amendment 6:

> a.   Attachment JL.14, Price Model
>
> b.   Attachment JL.15, FFP Fully Burdened Ceiling Rates
>
> c.   Attachment JL.16, FFP Indirect Ceiling Rates

46.     Suspiciously, Attachment JL.14, Price Model is *strikingly* similar to NAVFAC's Cost Model, Attachment JL.7.  In fact, Tab 14A of Attachment JL.14 includes the words  "Cost Model" in multiple cells, including B4, A13, B19, and A28.  This inclusion of "cost" terminology in the purportedly "fixed price" portion of the RFP strongly suggests that NAVFAC did not change the underlying cost/price model at all—instead NAVFAC merely updated the language to its preexisting Cost Model to include references to prices, and proceeded to characterize it as a new pricing model against which NAVFAC would perform a price analysis.

47.     Third, NAVFAC updated the RFP to now apply a number of the existing provisions to both CPAF and FFP contracts.  For example, offerors are now not permitted to exceed their

proposed "Direct Labor Rate Ceilings" for the FFP contracts, when previously this provision only applied to the CPAF orders. Amend. 6 at 7.

48. Fourth, NAVFAC added a new H-7 section entitled, "PROFESSIONAL FULLY BURDENED LABOR RATES AND ESCALATION CEILINGS," which is only applicable to the FFP orders. Amend. 6 at 16. NAVFAC is now requiring that "[t]he labor categories and fully burdened labor hourly ceiling rates identified in Attachment JL.15 will become a part of the contract. The 'Fully Burdened Labor Rates' will be utilized for negotiation of FFP task orders/modifications. For FFP task orders, the contractor shall not exceed the fully burdened hourly ceiling rates provided in Attachment JL.15, for the respective ordering period, to build its price proposal. These ceiling rates are the maximum allowable rates that can be proposed or charged under firm fixed price task orders during the respective ordering period. These are not bid rates." Amend. 6 at 16.

49. Fifth, NAVFAC also added a new H-8 section entitled, "CEILING INDIRECT RATES AND AWARD FEE CEILING," which is only applicable to the FFP orders. Amend. 6 at 16. "Should actual indirect rates experienced during performance of the contract be lower than those shown in Attachment JL.16, actual rates will be charged in lieu of the maximum rates. All ceiling provisions will apply to the prime contractor and the applicable ceiling rates will be included in the contract resulting from this solicitation." Amend. 6 at 16.

50. However, despite requiring myriad new information and opening the door for any offeror to update their entire proposal, NAVFAC failed to actually request any prices.

51. In standard solicitation practice, NAVFAC included Section L-2, "Instructions For Submitting Questions Regarding The Solicitation," which informed SLS-FS that "[a]ll inquiries

12

concerning" Amendment 6 must be submitted "at least a week" in advance of the proposal submission date of July 28, 2023.

52.    In response and by the required deadline, SLS-FS submitted *thirty three* questions to NAVFAC outlining and seeking clarification on a number of the issues that SLS-FS has detailed above regarding Amendment 6's evaluation scheme.  Given that SLS-FS had met the deadline for questions submission, SLS-FS expected that NAVFAC would actually engage on these issues and provide SLS-FS (and the other offerors) with substantive responses to the questions.

**G.    NAVFAC Issues Amendment 7 and Fails to Answer SLS's Questions**

53.    On July 26, 2023 (which was two days before the proposal submission deadline), NAVFAC informed SLS-FS (and, on information and belief, the other offerors) that it would be issuing another formal amendment to the RFP.  NAVFAC confirmed that it would therefore be extending the proposal submission deadline to at least August 4, 2023.

54.    NAVFAC then issued the operative Amendment 7 on July 27, 2023.  NAVFAC's stated reason for issuing Amendment 7 is "to provide questions and answers in response to the [S]olicitation."  Amend. 7 at 1.  Amendment 7 also "extends the due date of proposal to 9 August 2023, 4 PM." *Id.*

55.    However, Amendment 7 not only maintains the vast majority of the changes included in Amendment 6, but it goes further and includes additional updates to the new evaluation scheme that NAVFAC introduced in Amendment 6.  But despite making these changes in Amendment 7, NAVFAC fails once again to heed the Court's Order to only move forward with the RFP "in a manner consistent with" this Court's prior opinion.

56.    First, pages 2 through 3 of Amendment 7 includes NAVFAC's answers to *only eleven* questions from the potential offerors.  *See* Amend. 7 at 2-3.  As stated above, SLS-FS alone

submitted thirty three questions to NAVFAC.  On information and belief, NAVFAC has only answered a small subset of the questions that the potential offerors posed based on Amendment 6.

57.    Further troubling is that SLS-FS received answers to *only one* of its thirty-three questions.  SLS-FS only received a response to its initial question about extending the time for proposal submission.  That means that NAVFAC failed to answer any of the myriad substantive questions that SLS-FS proposed regarding the consequences of the Amendment 6 updates.

58.    Second, NAVFAC updated Attachment JL.6 from the prior Revision 1 to a new Revision 2.  *See* Amend. 7 at 3.  This update was non-substantive and changed the Fiscal Years headers for the included chart.

59.    Third, NAVFAC included some minor updates to administrative matters, such as permitting offerors to submit the pre-award survey electronically and requesting narrative explanations for any cost/price form cells that include blanks or zero dollar figures.

60.    Finally, and most importantly, NAVFAC updated how the agency will evaluate offerors' price and cost submissions:

> a.  Section M-1. Evaluation Factors For Award now includes the following additional text: "Because it is under cost-type work that the Government bears more risk, price will be evaluated only for reasonableness in accordance with FAR 15.404-1(b) and will not be further utilized in the trade-off analysis. Only the total evaluated cost will be used for purposes of the trade-off process."  Amend. 7 at 33.  NAVFAC will only be assessing price for reasonableness and therefore will not take price into account during the trade-off process.

b.   Volume II: Cost/Price Proposal now includes the following additional text: "Increasing Significance of Cost.  The importance of cost will increase if the Offeror's non-cost proposals are considered essentially equal in terms of overall quality, or if the cost is so high as to significantly diminish the value of a non-cost proposal's superiorirty [sic] to the Government.  If at any stage of the evaluation, all offerors are determined to have submitted equal, or virtually equal, or generally equivalent, non-cost proposals, cost could become the factor in determining which offeror(s) shall receive the award."  Amend. 7 at 37.  NAVFAC confirms here that if offerors' proposals are more or less equal, NAVFAC will potentially use "cost" as the determining factor for its award decisions.

c.   Volume II: Cost/Price Proposal also includes the following additional text: "**Use of Price/Cost in the Trade-Off Process**: As noted above, because it is under cost-type work that the Government bears more risk, price will be evaluated only for reasonableness in accordance with FAR 15.404-1(b) and will not be further utilized in the trade-off analysis. Only the total evaluated cost will be used for purposes of the trade-off process."  NAVFAC will therefore only be assessing cost (not price) during the "trade-off process" in the evaluation.

H.    **NAVFAC Issues Amendment 8 to Extend the Proposal Deadline**

61.    On August 2, 2023, NAVFAC issued yet another Amendment, Amendment 8, extending the proposal deadline to August 25, 2023, but otherwise leaving the terms of the solicitation unchanged and Amendments 6 and 7 in place. *See* Amend. 8.  Amendment 8 indicates that more amendments will be forthcoming, but does not specify when.

15

## THE STATUTORY PROHIBITION OF COST-TYPE CONTRACTS FOR MILITARY CONSTRUCTION

62.     Congress has specifically prohibited the use of "any form of cost-plus contracting" for military construction projects.  10 U.S.C. § 3323.[2]  This prohibition applies "notwithstanding. [sic] a declaration of war or the declaration by the President of a national emergency under section 201 of the National Emergencies Act (50 U.S.C. 1621) that includes the use of the armed forces." *Id.*

63.     This law is one result of concerns raised in the early 2000's after spending on government contracts dramatically increased.  In 2009, the White House reported that since 2001, spending on government contracts had more than doubled.  *See* White House Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 9755 (Mar. 4, 2009).  The White House attributed this large increase in part to the increased use of cost-type contracts.  *See id.* (during this same period, "dollars obligated under cost-reimbursement contracts nearly doubled. . . .").

64.     The White House reported that GAO "and other independent reviewing bodies have shown that noncompetitive and cost-reimbursements contracts have been misused, resulting in wasted taxpayer resources, poor contractor performance, and inadequate accountability for results." *Id.*

65.     During this same time period, Congress was similarly concerned about the cost overruns related to the use of cost-type contracts, especially by DoD.  In multiple congressional hearings Congress questioned the use of cost-type contracts.  For example:

---

[2] This provision was previously codified at 10 U.S.C. § 2306 but was transferred to 10 U.S.C. § 3323 when Title 10 was reorganized pursuant to the National Defense Authorization Act for Fiscal Year 2021.  *See* Pub. L. 116-283, Div. A, Title XVIII, § 1817(a), (g), 134 Stat. 4186, 4187 (2021).

a.   In the February 1, 2011 hearing on "Improving Federal Contract Auditing," Senator McCaskill noted to a witness from the Department of Education, "[i]f I could just make sure that the Defense Department had as many fixed-price contracts as you have, I would be a happy camper.  There is certainly not the level of cost-plus going on in your agency that there is in Defense."  *Improving Federal Contracting Auditing: Hearing Before the S. Ad Hoc Subcommittee on Contracting Oversight*, 112th Cong. 13 (2011) (statement of Sen. Claire McCaskill).

b.   In the May 10, 2011 hearing on "Roadmap For a More Efficient and Accountable Federal Government: Implementing The GPRA Modernization Act," a witness described, "I would argue that a little bit of investment in the capacity and the capability of the contracting officers could have a big return on the $535 billion a year we spend on contracting. So it does lead to a process that too often is too slow, not competitive enough, and relies too heavily on cost-plus contracts as opposed to fixed-price contracts."  *Roadmap for a More Efficient and Accountable Federal Government: Joint Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 112th Cong. 21 (2011) (statement of Hon. Eugene L. Dodaro, Comptroller General, U.S. GAO).

c.   In a July 6, 2011 debate, Senator Coburn stated, "[w]hen we make statements that say if, in fact, we make major cuts in the discretionary portion of our budget, the things we count on will have to be sacrificed, it is not true, for there is at a minimum $350 billion a year spent on duplication within the Federal Government, and waste . . . It doesn't count the Pentagon, where we have the Pentagon having duplicate weapons systems, noncompetitive contracts, cost-plus contracts where we have requirement creep so they end up costing much more than they ever should because we don't have the responsible person over there saying, no, you

can't have everything you want. What you want is to have the things you need." 157 CONG. REC. S4345 (daily ed. July 6, 2011) (statement of Sen. Coburn).

d. In the Dec. 15, 2011 hearing on "The Military-Industrial-Congressional Complex", Senator John McCain stated: "In the military-industrial-congressional complex, if excessive concurrency is a drug, then the cost-plus contracts used to facilitate it are its delivery vehicles." 157 CONG. REC. S8629 (daily ed. Dec. 15, 2011) (statement of Sen. McCain).

66. These concerns compelled Congress to take action. The National Defense Authorization Act for Fiscal Year 2007 called for updating the DoD regulations relating to development programs to

> provide that the Milestone Decision Authority may authorize the use of a cost type contract under subsection (c) for a development program only upon a written determination that-- (1) the program is so complex and technically challenging that it would not be practicable to reduce program risk to a level that would permit the use of a fixed-price type contract; and (2) the complexity and technical challenge of the program is not a result of a failure to meet the requirements established in section 2366a of title 10, United States Code.

Pub. L. No. 109-364, § 818, 120 Stat. 2083 (2006).

67. Moreover, the National Defense Authorization Act for Fiscal Year 2009 called for revising the FAR:

> to address the use of cost-reimbursement contracts . . . [to] include, at a minimum, guidance regarding--(1) when and under what circumstances cost-reimbursement contracts are appropriate; (2) the acquisition plan findings necessary to support a decision to use cost-reimbursement contracts; and (3) the acquisition workforce resources necessary to award and manage cost-reimbursement contracts.

Pub. L. No. 110-417, § 864, 122 Stat. 4356 (2008).

18

68.    The 2009 Act further required that the Inspector General for each executive agency should review the use of cost-reimbursement contracts by the agency and that the Director of the Office of Management and Budget

> shall submit an annual report to Congressional committees identified in subsection (e) on the use of cost-reimbursement contracts and task or delivery orders by all executive agencies. . . . The report shall include-- (1) the total number and value of contracts awarded and orders issued during the covered fiscal year;  (2) the total number and value of cost-reimbursement contracts awarded and orders issued during the covered fiscal  year; and (3) an assessment of the effectiveness of the regulations promulgated pursuant to subsection (a) in ensuring the appropriate use of cost-reimbursement contracts.

*Id.*

69.    Most notable here, in order to address these concerns, the National Defense Authorization Act for Fiscal Year 2012 included a "Prohibition on [the] use of any cost-plus system of contracting for military construction and military family housing projects."  This requirement remains in effect.  *See* 10 U.S.C. § 3323 (2022).

70.    The concerns about the inefficiency and waste of taxpayer dollars have persisted. As recently as October 2021, the Office of the Inspector General of the National Security Agency warned that the: "[t]he Agency had inadequate oversight of the actual costs of cost-reimbursement contracts due to vague and ineffective COR roles, responsibilities, and oversight procedures." Nat'l Sec. Agency, AU-19-0010, *Audit of Cost-Reimbursement Contracts* (2021).  The audit conducted in 2021 also revealed that "tools that did not meet the demands of managing large, complex cost-reimbursement contracts with voluminous Technical Task Orders (TTO) added to a heavy COR workload."  *Id.*  The report found that "[t]he Agency's process for managing expenses on cost-reimbursement contracts did not mitigate the significant risks associated with these type of contracts."  *Id.*

## CLAIMS ASSERTED

71.     As noted above, the RFP calls for task orders under this contract to be awarded on either a CPAF or FFP basis.  RFP at 4.  When NAVFAC previously failed to evaluate price, and instead focused solely on cost, this Court found that the agency did not comply with the terms of the RFP and FAR 15.404(1)(b).  The agency's latest attempt fairs no better.  For the reasons explained below, NAVFAC's price evaluation scheme is arbitrary, capricious, and contrary to law.

### A.     The RFP Violates 10 U.S.C. § 3323

72.     10 U.S.C. § 3323 prohibits the use of cost-plus contract types in military construction projects, without exception.  This statute provides:

> a) Prohibition.  A contract entered into by the United States in connection with a military construction project or a military family housing project may not use any form of cost-plus contracting.

73.     This contract is a contract for "global contingency construction" which primarily consists of "providing supervision, equipment, materials, labor, travel and all means necessary to provide the Navy and the Navy on behalf of Department of Defense (DOD), or other Federal agencies when authorized, an immediate response for civilian construction contract capability." RFP at 4.  This contract "will be predominately construction," RFP at 4, and the statutory prohibition on the use of cost-plus contracting clearly applies to this procurement, and specifically to any task orders for construction.

74.     The RFP purports to comply with this limitation by stating that the task orders awarded under this RFP will be on *either* a CPAF or FFP basis.  *See* RFP at 4.  To comply with 10 U.S.C. § 3323 this necessarily means that NAVFAC has predetermined that all construction under the RFP will be performed on a FFP basis, while presumably other incidental services would be ordered on a CPAF basis.

20

75.    However, NAVFAC has failed to request sufficient information to allow it to make a statutorily compliant award based on a FFP competition.  In particular, nothing in this RFP asks for a *price* for construction.

76.    To be clear, multiple cost elements can be a "price" in the abstract.  The amount paid for a piece of lumber is a "price" where the end product being acquired is lumber, for instance to maintain inventory in a lumberyard.  However, where the end item being acquired is a constructed building, the amount paid for "lumber" is a *cost*.  It does not matter what label is applied to the cost element—what matters is what is ultimately being acquired.

77.    Here the elements that NAVFAC is requesting offerors to provide, such as fully burdened labor rates, are at best "prices" for other, non-construction purposes like a procurement only interested in acquiring supplemental labor support.  However, fully burdened labor rates are not "prices" where the end item being acquired is not labor, but rather construction—in which case fully burdened labor rates are simply costs.

78.    CICA requires that agencies must "include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals."  10 U.S.C. § 3206(c)(1)(B); *see also* FAR 15.304(c)(1)(i) ("Price or cost to the Government shall be evaluated in every source selection").

79.    The method of review for cost or price must be relevant and germane to the award that is being contemplated.  For instance, it make no sense and is arbitrary and capricious to evaluate an offeror's indirect rates when the awarded contract will be based on competitively submitted lump sum pricing.

80.    As the RFP has committed to awarding contracts for billions of dollars of FFP construction, NAVFAC cannot make an award compliant with the RFP by only reviewing

**individual elements** of the offerors' costs such as labor rates.  Indeed, as explained more fully below, the RFP has not even requested all of the necessary cost elements to construct a price for a construction project, even if that is what NAVFAC was attempting to do.

81.     Significantly, the RFP states that it intends to award FFP task orders on a **lump sum basis** without requiring cost elements.  "Each proposed FFP TO [task order] will indicate the detail of pricing information to be provided.  **Normally, a competitive proposed TO will require only a lump sum or unit price offer**, but the Contracting Officer reserves the right to obtain a more detailed cost breakdown of labor materials, equipment, overhead, and profit at any time." RFP at 21 (emphasis added).

82.     However, rather than asking for any lump sum or unit price proposals from offerors that would be consistent with the concept of a FFP procurement, the RFP now requires offerors to provide certain, limited and incomplete cost elements—none of which allow NAVFAC to evaluate an offeror's final, all-inclusive, price for construction.

83.     Ultimately the "FFP" methodology that the RFP proposes does not appear to be contemplating a "FFP" contract or task order at all.  The RFP expects offerors to provide specific cost elements—which as explained below are typically not required for a FFP contract and not appropriate for a price analysis.

84.     Moreover, the RFP expects that "indirect rates" will be adjusted annually to reflect the actual costs that the contractor incurred.  "Additionally, should actual rates experienced during performance of the contract be lower than the ceiling rates shown, actual rates will be billed." Amend. 7 at 28.  This addition to the RFP appears to contemplate a "true-up" process that is the epitome of a cost reimbursement contract—the type of contract specifically prohibited for DoD construction by 10 U.S.C. § 3323.

**B.      NAVFAC's Evaluation Scheme Violates 10 U.S.C. § 3206 and the FAR by Failing to Consider Price in the Best-Value Tradeoff Analysis**

85.      Under 10 U.S.C. § 3206(c)(1)(B), the government is required to "include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals."  Therefore, NAVFAC is required to consider cost or price as part of its evaluation for this procurement.

86.      In this case, it is paramount that NAVFAC consider both cost and price as part of its evaluation of proposals given that, as found by this Court in *SLS Federal Services LLC,* "of the two contract-line-item numbers (CLIN), [NAVFAC] explained that over half of all work would be performed under CLIN 002 as firm fixed price task orders.  *See* AR 252 (anticipating that $3 billion of all task orders would be firm fixed price)." 163 Fed. Cl. at 600.  Where firm fixed price task orders will make up *over half* of all future task orders under this five-billion-dollar contract, price is obviously a relevant and important factor.

87.      Amendment 7 flouts this requirement and instead proposes a best-value determination that will entirely ignore price, and will not even consider price in the tradeoff process at all:

> **Use of Price/Cost in the Trade-Off Process**: As noted above, because it is under cost-type work that the Government bears more risk, price will be evaluated only for reasonableness in accordance with FAR 15.404-1(b) and will not be further utilized in the trade-off analysis. Only the total evaluated cost will be used for purposes of the trade-off process.

Amend. 7 at 38 (emphasis in original).

88.      By removing price from the actual best-value determination of these proposals, NAVFAC is not considering price "as an evaluation factor" in this solicitation, which is in clear violation of CICA.

23

89.    Further, NAVFAC's actions to remove price from the best-value determination are in breach of the FAR's requirements for how agencies must conduct a best-value tradeoff evaluation.

90.    FAR 15.101 (Best value continuum) details how "[a]n agency can obtain best value" in procurements if it uses "any one or a combination of source selection approaches."  What each of these approaches has in common is a relative weighting of "technical or past performance considerations" against "cost or price."  *Id.*  Agencies must include some weighting for both of these sets of factors.  *Id.*

91.    FAR 15.101-1 describes one of the approved methods: the Best Value Tradeoff process.  One requirement when conducting a best value tradeoff analysis is that NAVFAC must "clearly state[] in the solicitation" "[a]ll evaluation factors and significant subfactors that will affect contract award."  *Id.*

92.    NAVFAC made it clear in the RFP that it would be evaluating offerors' proposals using a "trade-off analysis."  Amend. 7 at 33.  And in this solicitation where NAVFAC is procuring over three billion dollars of firm-fixed-price services, price plainly must be an evaluation factor for this trade-off analysis.   This is why NAVFAC included price as part of the best-value evaluation in the RFP all the way through Amendment 6, before dropping it (without explanation) in Amendment 7.  NAVFAC must evaluate price in the best-value determination where it has included (and must include) price as an evaluation factor.

93.    FAR 15.308 also requires that NAVFAC base its award decision "on a comparative assessment of proposals **against all source selection criteria in the solicitation**."  (emphasis added).  NAVFAC is not permitted to simply decide at this stage to remove price entirely from the best-value assessment and relegate it to a mere reasonableness checkbox before proceeding with

24

the actual best-value determination in the RFP.  Neither CICA nor the FAR permit price to be so relegated that it is not even included in the best value determination.

**C.      The RFP Improperly Postpones Consideration of Price Until After Contract Award**

94.      To the extent that NAVFAC intends to continue the scheme described in the RFP where the government intends to have competitions for future task orders, the procuring agency *is not permitted* to delay the evaluation of cost or price until the task order award phase except in unique circumstances.  The only circumstance under which an agency may delay the assessment of cost or price until the award of a task order is where the agency issues a solicitation for multiple task or delivery order contracts "for the same or similar services and *intends to make a contract award to each qualifying offeror*."  10 U.S.C. § 3206(c)(3) (emphasis added).

95.      Under these rules, if an agency agrees to award contracts to all qualifying offerors, then the agency may delay the consideration of prices until the competition for task orders.  However, an agency may not award contracts to only some of the qualifying offerors and consider price later.

96.      Here, and as explained more fully below, the RFP requests information on various elements of a price including certain labor rates and indirect rates; however, the RFP does not request a "price" for any construction project or proposal.  Therefore, by making contract award decisions at this stage—and eliminating some qualifying offerors—NAVFAC is violating the requirement to consider price at the time of contract award.

97.      The information requested by the RFP is, at most, information about select cost elements of a price for construction task order.  However, even in requesting the provision of those cost elements, the RFP fails to request multiple relevant elements for construction, such as material costs, the number of labor hours required, the mix of labor hours needed, labor rates for multiple

25

trades, and fixed-price subcontractor costs. Therefore, even if NAVFAC were attempting to review "prices" by reviewing all of this requested cost build-up information—which as explained below is a disfavored method for performing a "price analysis"—the RFP fails to request all of the potential cost elements that would constitute an ultimate price. Accordingly, nothing in the RFP requests a true "price" for a construction procurement.

98. Yet NAVFAC is proposing an evaluation of these individual cost elements as part of its evaluation of the FFP portion of the RFP, which is an improper attempt to eliminate some qualifying offerors at the contract award stage, and improperly delays the assessment of prices for these FFP task orders until the task order process. As an example, the RFP makes clear that even the cost elements that NAVFAC is requiring offerors to provide with their response to the RFP do not need to be used in pursuing any particular FFP task order.

99. For instance, the RFP makes clear that the fully burdened labor rates provided are "ceiling rates [that] will be the maximum allowable rates that can be proposed or charged under firm fixed price task orders issued during the ordering period of any contract awarded as a result of this solicitation. . . . Labor rates proposed for individual task orders may be less . . . ." Amend. 7 at 24.

100. In short, the actual "price" that any offeror proposes for a FFP task order will depend on (A) multiple elements that NAVFAC has *never* reviewed (such as labor hours needed, materials costs, subcontractor costs), and (B) other cost elements that NAVFAC did request, such as fully burdened labor rates, which offerors are free to significantly adjust in their individual task order proposals. Therefore, NAVFAC will not—and cannot—assess price at the contract award stage.

26

101.    The entire process proposed for deciding the award of these GCC contracts appears to be premised on a review of a handful of cost elements—despite the fact that the contract calls for the award of billions of dollars of construction task orders on a FFP basis.  NAVFAC is improperly reserving the evaluation of actual prices until the task order award phase of the procurement—in violation of CICA.

**D.    NAVFAC Has Proposed a Fundamentally Flawed Price Evaluation**

**1.    Amendment 7 Evaluates Cost Rather than Price, in Violation of the FAR and this Court's Prior Order**

102.    The government's proposed price evaluation fails to comply with applicable law and the terms of the RFP.  While the government is supposed to be conducting a price evaluation under the COFC Decision related to this procurement, the evaluation scheme the government has proposed appears to be yet another cost evaluation in practice, contrary to the FAR and this Court's order.

103.    Under FAR 15.404-1, the government "shall" use a price analysis in evaluating proposals "when certified cost or pricing data" is not required.  As the COFC has already found, this procurement does not require certified cost or pricing data under FAR 15.403-1(b)(1) because the contract is adequately competed, and award "will be made to the offeror whose proposal represents the best value [and] where price is a substantial factor in source selection."  FAR 15.403-1(c)(1)(i)(B); *SLS Fed. Servs.*, 163 Fed. Cl. at 602.  Accordingly, the government is required to use a price analysis in evaluating proposals.  *Id.*

104.    The FAR explains that a price analysis is "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit."  FAR 15.404-1(b).  While there are several ways of analyzing price, "[c]omparison of proposed prices received in response to the solicitation" is typical, as adequate price competition

27

"[n]ormally…establishes a fair and reasonable price." FAR 15.404-1(b)(2)(i). "[A]t a minimum, the contracting officer shall obtain appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determine if the data is adequate for evaluating the reasonableness of the price." FAR 15.404-1(b). Moreover, while "[p]rice analysis may include evaluating data other than certified cost or pricing data obtained from the offeror or contractor," that is only the case "when there is no other means for determining a fair and reasonable price." *Id.*

105. In contrast, a cost analysis is "the review and evaluation of any *separate cost elements* and *profit or fee* in an offeror's or contractor's proposal, as needed to determine a fair and reasonable price or to determine cost realism, and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency." FAR 15.404-1(c) (emphasis added).

106. Here, the government has made the same error as in previous iterations of this procurement: it has nowhere asked offerors for any *price* information, and is instead attempting to conduct yet another cost evaluation. The government's price evaluation scheme analyzes individual cost elements, requiring contractors to provide what is essentially cost-build up information, including labor rates for certain identified labor categories, indirect rates, and profit rates. *See* JL.14, JL.15, JL.16.

107. The government then plans to add these and other costs together, along with the profit rate proposed by the contractor, to obtain the "price" of the contract. *See* JL.14. Indeed as seen below, the "price" model the government proposes appears to be very similar to the cost model in JL.7, and in fact, the government appears to have forgotten to substitute the term "price" for the term "cost," in at least two places, highlighted in blue.

ATTACHMENT JL.14A
PRICE MODEL SUMMARY

| | Total Cost Model Value for Base Year | % of Work | Total Value of Base Year Based on % of Work |
|---|---|---|---|
| Company JV1 or Prime (CONUS) | $0.00 | | $0.00 |
| Company JV2 | $0.00 | | $0.00 |
| Total for CONUS | | | $0.00 |
| Company JV1 or Prime (OCONUS) | $0.00 | | $0.00 |
| Company JV2 | $0.00 | | $0.00 |
| Total for OCONUS | | | $0.00 |
| Total Value of Cost Model for Base Year | | | $0.00 |

Notes:

1. For evaluation purposes, the Government will utilize the percentages listed on Attachment JL.4 (Distribution of Work) and will then analyze the price model by adding the total presented for CONUS work to the total for OCONUS work (this will be performed for the base and each option year) to arrive at a TOTAL PRICE MODEL VALUE (PER YEAR).

ATTACHMENT JL.7A, N62470-20-R-5003
SUMMARY COST MODEL FOR MULTIPLE OFFERORS FOR BASE YEAR

| | Total Cost Model Value for Base Year | % of work | Total Value of Base Year based on % of Work |
|---|---|---|---|
| Company JV1 or Prime (CONUS) | $0.00 | | $0.00 |
| Company JV2 (or Cost Reimb. Sub) (CONUS) | $0.00 | | $0.00 |
| Total for CONUS | | | $0.00 |
| | | | |
| Company JV1 (OCONUS) | $0.00 | | $0.00 |
| Company JV2 (or Cost Reimb. Sub) (OCONUS) | $0.00 | | $0.00 |
| Total for OCONUS | | | $0.00 |
| | | | |
| | | | |
| TOTAL VALUE OF COST MODEL FOR BASE YEAR | | | $0.00 |

**Note 1**: For evaluation purposes, the Government will utilize the percentages listed on Attachment JL.4 (Distribution of Work) and will then analyze the cost model by adding the total presented for CONUS work to the total for OCONUS work (this will be performed for the base and each options year) to arrive at a TOTAL COST MODEL VALUE (PER YEAR)

**Note 2**: In the event an offeror utilizes multiple cost centers, the cost model will be filled out for each cost center expected to be utilized in the performance of this contract. For evaluation purposes, the cost center with the highest "Total" price for the cost model (total price is the addition of the CONUS and OCONUS totals), will be utilized.

108.    The government's proposed price model appears to fit the definition of a cost analysis exactly, as it evaluates "separate cost elements" as well as the "contractor's profit," which is capped. JL.14; FAR 15.404-1(c). Nowhere does the government ask for information that would enable it to compare offerors' prices, or explain why the government cannot otherwise obtain adequate price data.

109.    As a result, the government has *failed to comply* with both the Court of Federal Claims' order directing the government to perform a price evaluation, *see supra*, as well as the terms of the RFP itself, which calls for FFP task orders. RFP at 4.

30

110.    In addition, the price evaluation scheme also violates FAR 15.403-3, which generally restricts contracting officers from collecting cost data from offerors "when adequate price competition exists," which, as noted above, this Court has already concluded is present here. *See* FAR 15.403-3(b); *see also* FAR 15.403-3(a)(1)(iii).   And even when there are "unusual circumstances where it is concluded that additional data [is] necessary to determine the reasonableness of price, the contracting officer shall, to the maximum extent practicable, *obtain the additional data from sources other than the offeror*."   FAR 15.403-3(b) (emphasis added).

111.    Thus, while FAR 15.403-3 does not prohibit a contracting officer entirely from collecting data of the kind the government is asking for here, this provision makes clear that cost data should not be the starting point where adequate price competition exists.

112.    But here, the government's *entire* price evaluation is based on the evaluation of cost data provided by the offeror, and nowhere has the government explained the need for this data or what "unusual circumstances" exist that prevent the government from determining a fair and reasonable price simply by comparing prices amongst offerors.   For that reason too, the price evaluation scheme is in violation of law.

### 2.    The Price Evaluation Scheme is Arbitrary and Capricious

113.    The price evaluation scheme is also arbitrary, capricious, and an abuse of discretion. As a method for evaluating price, the evaluation scheme NAVFAC has proposed in this latest amendment makes little sense.  Nowhere has NAVFAC actually asked offerors for *prices*.  Instead, NAVFAC appears to be attempting to construct a price from cost-build up information based on specific labor rates with profit built-in, based on an arbitrary number of hours.  *See* JL.14, JL.15. Setting aside the regulatory problems discussed above with requesting cost-build-up information on a FFP contract, there are several practical problems with this as well.

31

114. First, using labor rates as a proxy for price in the construction context leaves out a huge component of the actual cost (and by extension, price) of the ultimate product: materials. Material costs would undoubtedly make up a large part of the cost—and therefore the ultimate price—of constructing a building, for example. Yet NAVFAC's price evaluation scheme does not request or consider this kind of information at all, meaning that any "price" based solely on the information NAVFAC has requested—the labor rates—will be artificially low. That will also make it difficult—if not impossible—for NAVFAC to compare "prices" amongst offerors in any meaningful way, as required under FAR 15.404-1(b). The government offers no explanation for this decision.

115. Even the labor rates NAVFAC is considering appear to be an artificially small subset of the labor that would likely be involved in many construction projects. NAVFAC asks for information about primarily white-collar workers—accountants, managers, engineers, and health officials, *see* Attachment JL.14, JL.15—but no information about the cost of any of those categories of labor that one might expect to see involved in construction: e.g., stone masons, framers, electricians, plumbers, roofers, and painters, to name just a few.

116. Further, the RFP focuses solely on the labor rates of the *prime* contractor without accounting for any fixed-price subcontractor costs, *id.*, which fails to account for the realities of how construction work is done. A prime contractor is likely to hire multiple subcontractors who will be responsible for much of the work, and that is where much of the innovation and cost savings will occur.

117. Indeed, a key point of competition amongst prime contractors in construction is the price of their subcontractors—differences in the price of subcontractors would be a significant way for the government to differentiate amongst offerors. But the government has apparently assumed

that all contractors are going to pay their subcontractors the same amount—including an arbitrary plug number of $10 million—for subcontractor labor for each year in both the CONUS and OCONUS models. *See* JL.14. In short, NAVFAC has arbitrarily assigned $160 million in subcontractor costs to each offeror's proposal without permitting those offerors to actually propose their own subcontractor costs. Again, the failure to consider this kind of additional information in evaluating an offeror's price distorts the true cost/price of the project—and the realities of the construction industry—and makes meaningful price comparisons amongst offers difficult.

118. In addition, Note 10 on the price model indicates that prime contractors will not be able to competitively bid future task orders. This Note states that FFP task orders will be solicited "using fully burdened ceiling labor rates and the percent ceilings for Subcontractor Labor markup and Profit," as specified in JL.14, JL.15, and JL.16. *See* JL.14 (Base Year, n.10). In other words, the prime contractor's price will be assigned to them via a prescribed price model (like JL.14) that calculates price as a function of Subcontractor Labor. *Id.* Again, the government is ignoring the competition to be had in the price of subcontractors, constraining a prime contractor's ability to competitively bid a task order.

119. Curiously, the notes on the price model also state that "direct cost amounts presented above are for informational purposes only and not necessarily representative of actual costs to be incurred on the contract." JL.14 (Base Year, n.5). It is unclear why costs used "for informational purposes only" are being used to determine a contractor's proposed price.

120. In addition, it is unclear to what "direct cost amounts presented above" is referring. JL.14 (Base Year, n.5). The language could be in reference to the information that NAVFAC is requiring offerors to include, like the $10 million subcontractor labor cost, but the term "direct cost amounts" also applies to other information such as the labor costs that NAVFAC is

purportedly evaluating by reviewing proposed labor rates against the dictated labor hours. If all the direct cost amounts are for "informational purposes," this entire evaluation scheme appears ineffective.

121.    Elsewhere, it appears that NAVFAC intends to impose a cap on the labor rates for trades not listed in JL.14 and JL.15, requiring contractors to pay *only* the minimum wage set by the Davis Bacon Act ("DBA"), Service Contract Act ("SCA"), and others, and not higher. *See* Amend. 7 at 24-25 (*referring to* 40 U.S.C. § 3142(a) (DBA); 41 U.S.C. § 6701(4)(A)-(B) (SCA)). This seems oddly contrary to the policies behind these minimum wage statutes—a minimum wage, after all, is supposed to be a price *floor*, not a price ceiling. But this choice also fails to account for the realities of hiring workers in a constrained labor market—contractors may well have to pay significantly above the minimum wage rate in order to hire good workers, driving up their costs, which should in turn drive up the price of the contract. The government's pricing scheme does not permit this nor will it consider it in evaluations of offers.

122.    Further, the government fails to account for the variations in geographic coverage of wage determination statutes like the DBA and SCA. The government's price evaluation scheme appears to assume that all labor categories not listed in JL.15, and subject to wage determination statutes like the DBA or SCA, will be paid the minimum wage rate under those statutes. *See* Amend. 7 at 25 ("The SCA and DBA rates used for proposals and billing purposes under individual task orders SHALL REFLECT THE MINIMUM RATES set forth on the applicable wage determination.…" (capitalization original)).

123.    But this fails to account for the fact that the solicitation calls for work that could take place anywhere in the world. The DBA and SCA apply only to the United States, defined to include the 50 states, the District of Columbia, and in the case of the SCA, certain U.S. territories.

34

*See* 40 U.S.C. § 3142(a) (DBA); 41 U.S.C. § 6701(4)(A)-(B) (SCA).  Thus, depending on where the task orders take place, prevailing wage rates for those labor categories *not* listed on JL.15 could vary significantly.  And while the government has divided contract costs into "CONUS" and "OCONUS" categories, Amend. 7 at 29, this distinction is not an adequate proxy for which contracts would and would not be covered by these wage determination statutes.  Alaska and Hawaii, for example, while considered "OCONUS" for purposes of the RFP, are both covered by the SCA and DBA since they are unquestionably part of the United States.  Japan, however, while likewise considered "OCONUS" under the RFP, is not covered by either the SCA or DBA as it is unquestionably outside the United States.  By failing to consider these issues, the government is failing to account for a potentially significant factor in a contractor's cost—and price.

124.    NAVFAC is also requiring offerors to propose profit ceiling rates for FFP task orders.  *See* Amend. 7, Attachment JL.16 at 2-9.  As stated above, a separate review of profit is not required by the FAR for an adequate analysis of prices.  *See* FAR 15.404-1(b)(1).  In fact, requiring offerors to propose, in a vacuum, ceiling profit rates is in and of itself arbitrary and capricious.  The FAR acknowledges in a provision addressing pre-negotiation of price in scenarios where cost analysis is required, that "automatic application of predetermined percentages to total estimated costs do not provide proper motivation for optimum contract performance."  FAR 15.404-4(a)(3).

125.    In particular, the offerors here are contemplating work anywhere around the globe—potentially in dangerous or unstable conditions.  Without knowing the locations or circumstances of the work, requiring contractors to commit to ceiling profit rates is arbitrary and capricious, because in government contracts "profit" really just indicates "the potential total remuneration that contractors may receive for contract performance over and above allowable

costs." FAR 15.404-4(a)(1). "Profit" is also a place where contractors can price the risk that the contractors are taking on by agreeing to perform the work. *See* FAR. 16.202-1 (FFP contract places on the contractor the "maximum risk"). Requiring commitments to profit ceilings rates without knowing the context of performance is arbitrary and capricious.

126. In addition, the government's pricing scheme does not allow for a profit on subcontractors costs, ignoring the policy reasons why contractors should generally be allowed to profit. *See* JL.14 ("Profit Ceiling (only applied to Prime Labor and ODCs")). As articulated in FAR 15.404-4(a)(2), "[i]t is in the Government's interest to offer contractor's opportunities for financial rewards sufficient to stimulate efficient contract performance, attract the best capabilities of qualified large and small business concerns to Government contracts, and maintain a viable industrial base." NAVFAC's pricing scheme undermines this principle.

127. Further compounding this problem, the Government has stated its intention to treat offerors differently in the applicability of profit. In the Question and Answer process incorporated into the RFP through Amendment 7, the Government responded to an offeror's question by indicating that some offerors would be permitted to include profit on costs other than Prime Labor and ODCs. Specifically, one offeror noted that NAVFAC's proposed limitation on the applicability of profits was inconsistent with government contract accounting practices as applied by the Defense Contract Audit Agency ("DCAA"):

> **Question 105:** JL.16 under Profit Ceiling Rate Text says: "Profit shall not be applied to travel, subcontractor's cost at any tier, subcontractor mark-up, direct charged local state, etc. taxes, and any JV feed/mark-ups." Typically Construction firms have established accounting systems with the profit rate applied to all costs associated with the project. Will the government revise this direction to allow Construction firms to follow previously established accounting systems accepted by DCAA?

Amend. 7 at 3.

128. NAVFAC could have responded to this question in multiple ways. NAVFAC could have agreed to require offerors to actually submit prices rather than cost elements. NAVFAC could have agreed to remove the artificial—and contrary to DCAA practice—limitations on the applicability of profit to various costs. NAVFAC could have insisted on requiring compliance with its misguided RFP. Instead of any of those options, NAVFAC proposed to treat offerors differently based on whether DCAA has reviewed the offeror's accounting system:

> ***Answer 105:*** The intent of JL.16 is to define profit ceiling rates to be utilized in pursuance of firm fixed price task orders for the prime and all subcontractors. If your accounting system has been approved in regard to firm fixed price orders and the utilization of profit as described, please provide a narrative describing such, and provide copies of the DCAA-affiliated documents providing such approval.

Amend. 7 at 3.

129. NAVFAC's proposal to allow offerors to have different limits on their ability to apply profits to various costs in a task order competition is arbitrary and capricious and violates fundamental requirements that offerors be treated fairly and equally in proposal evaluation.

130. Furthermore, the RFP's price evaluation scheme is internally inconsistent. On the one hand stating that normally all that will be required for a FFP task order proposal is a lump sum or unit price, *see* RFP at 21, the RFP is simultaneously requiring that offerors provide fully burdened labor rates applicable to all FFP task orders, *see* Amend. 7 at 24. In addition, the RFP is requiring offerors to include an estimated cost of performance and award fee for all task orders including FFP task orders. *See id.* at 5 (Section G-4(1)(c)(vi)) and 12 (Section G-10 requiring calculation of maximum award fee based on disclosed costs). The RFP is also requiring offerors to provide indirect ceiling rates and profit ceiling rates that are applicable to all FFP task orders. *See* Amend. 7, Attachment JL.16 at 2-9. None of these requirements is consistent with a statement that normally "only a lump sum or unit price offer" is required. *See id.* at 7 (Section G-4(3)(d)).

131.    Finally, the government's evaluation scheme ignores the discretion typically afforded to contractors in an FFP contract.  The purpose of an FFP contract is to give contractors maximum flexibility in determining factors such as the wage rates and the mix of specific labor hours necessary to accomplish a project, while also incentivizing the contractor to innovate and minimize expenses where possible, since the contractor bears the risk of any cost-overrun.  *See, e.g.*, FAR 16.202-1 (Because the contractor bears "maximum risk and full responsibility for all costs and resulting profit or loss," fixed price contracts "provide[] maximum incentive for the contractor to control costs and perform effectively…").  The government's pricing scheme here distorts these principles by inhibiting the contractor's ability to perform efficiently and control costs while simultaneously forcing the contractor to bear all the risk of cost overruns.

**E.    NAVFAC Has Proposed a Cost-Plus-Percentage of Cost Type Contract**

132.    Amendments 6 and 7 to the RFP essentially lay out a cost scheme that creates an illegal cost-plus-percentage-of-cost contract type.

133.    10 U.S.C. § 3322(a) explains: "The cost-plus-a-percentage-of-cost system of contracting may not be used."

134.    A cost-plus-percentage-of-cost type of contract is one where the following factors are met:  "(1) payment is on a predetermined percentage rate; (2) the predetermined percentage rate is applied to actual performance costs; (3) contractor's entitlement is uncertain at the time of contracting; and (4) contractor's entitlement increases commensurately with increased performance costs."  *Mktg. Consultants Int'l Ltd.*, B-183705, 75-2 CPD ¶ 384 (Comp. Gen. Dec. 10, 1975).

135.    For its price proposal, the RFP requires offerors to propose a profit ceiling rate.  *See* Amend. 7, Attachment JL.16 at 2-9.  The instructions explain that the profit ceiling rate will not be applied to certain elements such as "travel, subcontractor's costs at any tier, subcontractor mark-

up, direct charged local, state, etc. taxes, and any JV fees/mark-ups." *Id.* Since other cost elements are not included in that limitation, the profit ceiling rate would presumably be applied to other cost elements for a "FFP" award including labor costs, material costs, and indirect costs.

136.    The applicability to indirect costs is particularly significant, because the RFP makes clear that even the so-called FFP task orders will be subject to a review of actual indirect costs. In the portion of the RFP specifically added by Amendment 7 to address indirect rates as applicable to FFP task orders, the RFP states: "Additionally, should actual rates experienced during performance of the contract be lower than the ceiling rates shown, actual rates will be billed." Amend. 7 at 28.

137.    Since the profit rate applies to indirect costs—which are dependent on the actual indirect costs incurred—this payment scheme meets the four factors and violates the cost-plus-a-percentage-of costs prohibition.

        a.  Profit is paid as a predetermined percentage rate which is the profit ceiling rate from RFP, Attachment JL. 16;

        b.  The predetermined percentage rate is applied to actual costs, including both direct costs and indirect costs;

        c.  The contractor's entitlement is uncertain at the time of contracting;

        d.  The contractor's entitlement increases with increased cost of performance

138.    In particular, the contract provisions that make clear that the government is going to do a review of "actual [indirect] rates experienced during performance" means that the government is making the profit rates that the contractor can apply dependent on the costs that the contractor actually incurs. *See* Amend. 7 at 28.

139.    At a minimum, this approach incentivizes contractors to certainly incur enough indirect expenses to ensure that the contractor maximizes its indirect rates and therefore increases its profits.

### F.    In the Alternative, NAVFAC Has Illegally Proposed a Fixed-Price Contract with Prospective Price Redetermination

140.    Even if the Court finds that NAVFAC has proposed to review fixed prices through the RFP terms—which it has not—the specific method described here violates FAR 16.206-3(a) limitations on the use of fixed-ceiling-price contract with retroactive price redetermination ("FCPRPR").

141.    FAR 16.206-1 explains that an FCPRPR contract has: "(a) a fixed ceiling price; and (b) retroactive price redetermination within the ceiling after completion of the contract."

142.    To the extent that NAVFAC has proposed a fixed price contract structure—even though it has not—this "fixed price" arrangement improperly includes a prospective price redetermination.  For the "FFP" task orders, NAVFAC is requiring offerors to agree to a price that will then be reviewed and re-evaluated after actual costs are incurred.  *See* Amend. 7 at 28 (explaining that prices will be lowered if actual indirect rates are below the ceiling indirect rates). Because the prices will be reviewed and adjusted based on actual costs and potentially prices will be reduced, the approach proposed by the RFP is not really a FFP arrangement and is instead a ceiling price with a potential retroactive redetermination—a FCPRPR contract.

143.    However, FCPRPR contracts are only permissible in a very limited set of circumstances including where "[t]he contract is for research and development and the estimated cost is the simplified acquisition threshold or less."  FAR 16.206-3(a).

144.    This is a contract for construction—not for research and development, therefore the FCPRPR contract format is impermissible.

40

145.    This is a contract for significantly more than the simplified acquisition threshold. The simplified acquisition threshold at this time is generally $250,000.  *See* FAR 2.101.  This procurement—and each task order—will be for significantly more than this amount again making the use of FCPRPR contracts impermissible.

146.    In addition, FCPRPR contracts can only be used where approved in writing by the head of the contracting activity.  FAR 16.206-3(d).  SLS-FS is not aware of any written approval from the head of the contracting activity to use an FCPRPR contract.

**G.    NAVFAC Has Compliant Alternative Contracting Methods at its Disposal**

147.    NAVFAC's failure to engage in corrective action that adequately addresses this Court's order does not foreclose the agency's ability to solicit the work described in the RFP.  As described below, there are a variety of contracting methods at NAVFAC's disposal that would be compliant with both governing FAR provisions and COFC's January decision.

148.    One alternative available to NAVFAC is to award contracts to all qualifying offerors and reserve review of pricing until the award of task orders.  *See* 10 U.S.C. § 3206(c)(3). This method would immediately eliminate any price or cost evaluation at this phase of the procurement, and thus would resolve the myriad issues with NAVFAC's current pricing model described above.  In particular, it would permit NAVFAC to engage in real, legitimate review of actual prices instead of engineered, improper reviews of individual cost elements taken out of context.

149.    NAVFAC could also choose to propose a seed task order where offerors are permitted to offer a concrete price for defined work that is then evaluated by the agency.  Under this model, NAVFAC would issue with the RFP an individual (or multiple) seed task orders that would "clearly describe all services to be performed . . . so the full cost or price for the performance of the work can be established when the order is placed."  FAR 16.505.  NAVFAC could then

award the seed task order to one offeror and IDIQ contracts to other offerors—even where those other offerors did not receive a seed task order. This method would, once again, allow for an evaluation of actual prices instead of individual cost elements taken out of context.

150. Lastly, NAVFAC could opt to do what they have claimed to have done from the beginning—request *real* firm fixed prices for potential work that could take place under the contract. As this Court observed in January, while "an agency's price evaluation is harder with contingent or uncertain performance [as here] . . . difficult is different from impossible." *SLS Fed. Servs.*, 163 Fed. Cl. at 603. Indeed, this Court identified "other procurements where agencies have . . . found a way" to evaluate price reasonableness in contingent contexts similar to those comprehended by the current RFP. *Id.* There is nothing that prevents NAVFAC from adopting similar methods to evaluate a true firm fixed price submission from each offeror here.

## COUNT I

## NAVFAC PROPOSES TO USE AN ILLEGAL COST-PLUS CONTRACT

151. SLS-FS incorporates by reference paragraphs 1-150 of the Complaint as if fully set forth herein.

152. 10 U.S.C. 3323 § prohibits the use of cost-plus contract types in military construction projects, without exception. This statute provides:

> a) Prohibition. A contract entered into by the United States in connection with a military construction project or a military family housing project may not use any form of cost-plus contracting.

153. 10 U.S.C. § 3323 prohibits NAVFAC's price evaluation scheme in Amendment 7 because the work under the contract will be predominantly for construction activities.

154. SLS-FS is prejudiced by NAVFAC's failure to abide by 10 U.S.C. § 3323 because it will be denied the opportunity to fairly compete for award of the contract.

155. SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

42

156.    The public interest will be served by proper enforcement of the procurement laws.

157.    There is no prejudice to NAVFAC from requiring compliance with the applicable statute.

**COUNT II**

**<u>NAVFAC IMPROPERLY REMOVED PRICE FROM THE BEST VALUE TRADEOFF ANALYSIS IN THE RFP</u>**

158.    SLS-FS incorporates by reference paragraphs 1–157 of the Complaint as if fully set forth herein.

159.    10 U.S.C. § 3206(c)(1)(B) requires that agencies "shall . . . include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals."

160.    In evaluating proposals, agencies are permitted to use one of several best value analyses as described in FAR 15.101.  FAR 15.101-1(b)(1) describes the Best Value Tradeoff process, which requires an agency to "clearly state[] in the solicitation" "[a]ll evaluation factors and significant subfactors that will affect contract award."

161.    FAR 15.308 also requires that NAVFAC base its award decision "on a comparative assessment of proposals against all source selection criteria in the solicitation."

162.    NAVFAC made it clear in the RFP that it would be evaluating offerors' proposals using a "trade-off analysis," which included price as one of the central evaluation factors.

163.    NAVFAC must evaluate price in the best-value determination where it has included (and must include) price as an evaluation factor, especially given that over half of the services that NAVFAC will obtain under this contract will be firm fixed price.

164.    SLS-FS is prejudiced by NAVFAC's failure to abide by 10 U.S.C. § 3206(c) and FAR 15.101 and 15.308 because it will be denied the opportunity to fairly compete for award of the contract.

165.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

166.    The public interest will be served by proper enforcement of the procurement laws.

167.    There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

COUNT III

NAVFAC IMPROPERLY POSTPONES CONSIDERATION OF PRICE UNTIL AFTER CONTRACT AWARD

168.    SLS-FS incorporates by reference paragraphs 1–167 of the Complaint as if fully set forth herein.

169.    10 U.S.C. § 3206(c)(1)(B) requires that agencies "shall (except as provided in paragraph (3)) include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals."

170.    10 U.S.C. § 3206(c)(3) provides an exception where "cost or price to the Federal Government need not, at the Government's discretion, be considered under paragraph (1)(B) as an evaluation factor for the contract award" only if the Government "intends to make a contract award to each qualifying offeror."

171.    NAVFAC does not request a "price" for any construction project or proposal in Amendment 7 and instead requests various cost rates to create a price.

172.    However, NAVFAC is also proposing to make contract award decisions at this stage of the evaluation process and eliminate some qualifying offerors prior to obtaining any price

proposals.  By doing so, NAVFAC is not actually considering price at the time of these contract award decisions.

173.    SLS-FS is prejudiced by NAVFAC's failure to abide by 10 U.S.C. § 3206(c) because it will be denied the opportunity to fairly compete for award of the contract.

174.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

175.    The public interest will be served by proper enforcement of the procurement laws.

176.    There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

**COUNT IV**

**<u>NAVFAC'S PROPOSED PRICE EVALUATION SCHEME VIOLATES FAR 15.403-1 AND 15.404-1</u>**

177.    SLS-FS incorporates by reference paragraphs 1–176 of the Complaint as if fully set forth herein.

178.    Under FAR 15.404-1, the government "shall" use a price analysis in evaluating proposals "when certified cost or pricing data" is not required.

179.    Under FAR 15.403-1(c)(1)(i), adequate price competition exists when the following three criteria are met:

   a.  (A) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement;

   b.  (B) Award will be made to the offeror whose proposal represents the best value where price is a substantial factor in source selection; and

   c.  (C)  There is no finding that the price of the otherwise successful offeror is unreasonable.

180. This procurement clearly meets all three criteria, and the COFC has already determined the same. *See SLS Fed. Servs.*, 163 Fed. Cl. at 602.

181. Accordingly, the government is required to use a price analysis in evaluating proposals.

182. Under FAR 15.404-1(b), price analysis requires that "the contracting officer shall obtain appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determine if the data is adequate for evaluating the reasonableness of the price."

183. Moreover, while "[p]rice analysis may include evaluating data other than certified cost or pricing data obtained from the offeror or contractor," that is only the case "when there is no other means for determining a fair and reasonable price." *Id.*

184. As with the prior iterations of this procurement, NAVFAC has once again failed to ask the offerors for any price information. The figures it is requesting from offerors can only be used to conduct a cost evaluation, which is not permitted in this procurement.

185. SLS-FS is prejudiced by NAVFAC's failure to abide by FAR 15.403-1 and 15.404-1 because it will be denied the opportunity to fairly compete for award of the contract.

186. SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

187. The public interest will be served by proper enforcement of the procurement laws.

188. There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

## COUNT V

## NAVFAC'S PROPOSED PRICE EVALUATION SCHEME VIOLATES FAR 15.403-3

189. SLS-FS incorporates by reference paragraphs 1–188 of the Complaint as if fully set forth herein.

190.    FAR 15.403-3 generally restricts contracting officers from collecting cost data from offerors "when adequate price competition exists," which, as noted above, the COFC has already concluded is present here.  *See* FAR 15.403-3(b); *see also* FAR 15.403-3(a)(1)(iii).

191.    Under FAR 15.403-3(b), even in the "unusual circumstances where it is concluded that additional data is necessary to determine the reasonableness of price, the contracting officer shall, to the maximum extent practicable, obtain the additional data from sources other than the offeror."

192.    Thus, where adequate price competition exists (as it does here), the contracting officer should not look to any other data, including cost data, in the first instance.

193.    NAVFAC's proposed price evaluation in Amendment 7 is entirely based on the evaluation of cost data and there is no explanation regarding the "unusual circumstances" that would require such an approach.

194.    SLS-FS is prejudiced by NAVFAC's failure to abide by FAR 15.403-3 because it will be denied the opportunity to fairly compete for award of the contract.

195.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

196.    The public interest will be served by proper enforcement of the procurement laws.

197.    There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

## COUNT VI

### NAVFAC'S PROPOSED PRICE EVALUATION SCHEME REQUEST AN ILLEGAL COST-PLUS-PERCENTAGE-OF-COST CONTRACT

198.    SLS-FS incorporates by reference paragraphs 1–197 of the Complaint as if fully set forth herein.

47

199. 10 U.S.C. § 3322(a) explains: "The cost-plus-a-percentage-of-cost system of contracting may not be used."

200. A cost-plus-percentage-of-cost type of contract is one where there the following factors are met: "(1) payment is on a predetermined percentage rate; (2) the predetermined percentage rate is applied to actual performance costs; (3) contractor's entitlement is uncertain at the time of contracting; and (4) contractor's entitlement increases commensurately with increased performance costs." *Mktg. Consultants Int'l Ltd.*, B-183705, 75-2 CPD ¶ 384.

201. As explained in detail above, Amendment 7 requires all of the four hallmarks of a cost-plus-percentage-of-cost type of contract:

      a. Profit is paid as a predetermined percentage rate which is the profit ceiling rate from the RFP;

      b. The predetermined percentage rate is applied to actual costs, including both direct costs and indirect costs;

      c. The contractor's entitlement is uncertain at the time of contracting;

      d. The contractor's entitlement increases with increased cost of performance.

202. SLS-FS is prejudiced by NAVFAC's failure to abide by 10 U.S.C. § 3322(a) because it will be denied the opportunity to fairly compete for award of the contract.

203. SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

204. The public interest will be served by proper enforcement of the procurement laws.

205. There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

**COUNT VII**

**NAVFAC'S PROPOSED PRICE EVALUATION SCHEME VIOLATES FAR 16.206-3(a)**

206.    SLS-FS incorporates by reference paragraphs 1–205 of the Complaint as if fully set forth herein.

207.    FAR 16.206-1 explains a fixed-ceiling-price contract with retroactive price redetermination ("FCPRPR") as follows: "(a) a fixed ceiling price; and (b) retroactive price redetermination within the ceiling after completion of the contract."

208.    NAVFAC is proposing to use this exact arrangement in Amendment 7 by requiring offerors to agree to a price for the "FFP" task orders that will then be reviewed and re-evaluated after actual costs are incurred.

209.    Under FAR 16.206-3(a), FCPRPR contracts are only permissible in a very limited set of circumstances including where "[t]he contract is for research and development and the estimated cost is the simplified acquisition threshold or less."

210.    This is a contract for construction—not for research and development, therefore the FCPRPR contract format is impermissible.  This is also a contract for significantly more than the simplified acquisition threshold therefore making the FCPRPR contract format impermissible.

211.    In addition, FAR 16.206-3(d) dictates that FCPRPR contracts can only be used where approved in writing by the head of the contracting activity.  SLS-FS is not aware of any written approval from the head of the contracting activity to use an FCPRPR contract.

212.    SLS-FS is prejudiced by NAVFAC's failure to abide by FAR 16.206-3(a) because it will be denied the opportunity to fairly compete for award of the contract.

213.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

214.    The public interest will be served by proper enforcement of the procurement laws.

215.    There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

## COUNT VIII

### NAVFAC'S PROPOSED PRICE EVALUATION SCHEME IS ARBITRARY AND CAPRICIOUS AND IS CONTRARY TO GOVERNING LAW

216.    SLS-FS incorporates by reference paragraphs 1—215 of the Complaint as if fully set forth herein.

217.    NAVFAC's stated reason for Amendment 6 is to change "the cost/price evaluation factor and the evaluation of proposals," in part because NAVFAC "determined the necessity of price model submissions." Amend. 6 at 1.

218.    However, NAVFAC's chosen method for evaluating price is arbitrary and capricious and contrary to the FAR and governing law, as outlined above.

219.    Further, NAVFAC is committing additional errors that create practical problems for NAVFAC's chosen approach in Amendment 7:

a.    By using labor rates as a proxy for price in the construction context, NAVFAC leaves out a huge component of the actual cost (and by extension, price) of the ultimate product: materials. This means that price will only be based on labor rates and will be artificially low.

b.    Even the labor rates NAVFAC is considering appear to be an artificially small subset of the labor that would likely be involved in many construction projects because NAVFAC is requesting information on primarily white-collar workers and leaving out myriad categories of labor that are required for construction.

c. NAVFAC intends to impose a cap on the labor rates for trades not listed in JL.14 and JL.15, requiring contractors to pay *only* the minimum wage set by the Davis Bacon Act, Service Contract Act, and others, and not higher, which entirely fails to account for the fact that offerors may have to pay significantly above the minimum wage rate in order to hire good workers.

d. NAVFAC requiring offerors to propose, in a vacuum, ceiling profit rates is arbitrary and capricious as the offerors do not know the context of performance for any given construction project under the Contracts.

e. NAVFAC's pricing scheme does not allow for a profit on subcontractor costs.

f. NAVFAC's proposed task order evaluation process potentially applies different standards to offerors as to which cost elements offerors can apply profits, based on whether the offeror's accounting system has been reviewed by DCAA.

g. Amendment 7's price evaluation scheme is internally inconsistent because while NAVFAC suggests that FFP task order proposals normally just require a lump sum or unit price, Amendment 7 requires offerors to instead provide fully burdened labor rates, an estimated cost of performance and award fee, indirect ceiling rates, and profit ceiling rates.

h. Amendment 7's entire pricing scheme ignores that the purpose of an FFP contract is to give contractors maximum flexibility to innovate and determine the best expense structure, while also taking on all the risk of any cost-overruns.

220.    SLS-FS is prejudiced by NAVFAC's failure to include a reasonable price evaluation because it will be denied the opportunity to fairly compete for award of the contract.

221.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

222.    The public interest will be served by proper enforcement of the procurement laws.

223.    There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

**COUNT IX**

**NAVFAC BREACHED THE COURT OF FEDERAL CLAIM'S PRIOR INJUNCTION**

224.    SLS-FS incorporates by reference paragraphs 1–223 of the Complaint as if fully set forth herein.

225.    In its January 3, 2023 Decision, the COFC granted SLS-FS's motion for judgment on the administrative record and "enjoined [NAVFAC] from proceeding with performance of the contracts awarded to Aptim, CDM, ECC, Gilbane, Jacobs, and Perini." *See SLS Fed. Servs.*, 163 Fed. Cl. at 608.

226.    The COFC also ordered that "[i]f [NAVFAC] moves forward with the solicitation, it will do so in a manner consistent with this opinion." *See id.*

227.    As described above, NAVFAC is not moving forward with Amendment 7 in a manner consistent with the COFC's January 2, 2023 opinion. By doing so, it is violating the Court's prior order and injunction.

228.    NAVFAC is proceeding with a price evaluation that still "fail[s] to request the pricing information that would enable it to analyze price reasonableness." *Id.* at 603. Moreover, NAVFAC's new price evaluation scheme is in direct contravention of a number of FAR provisions and related statutes.

229.    SLS-FS is prejudiced and will be damaged by NAVFAC's failure to abide by the Court's prior injunction because it will be denied the opportunity to fairly compete for award of the contract.

230.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

231.    The public interest will be served by proper enforcement of the Court's prior injunction.

232.    There is no prejudice to NAVFAC from requiring compliance with the Court's prior injunction.

**COUNT X**

**<u>INJUNCTIVE RELIEF</u>**

233.    SLS-FS incorporates by reference paragraphs 1–232 of the Complaint as if fully set forth herein.

234.    SLS-FS has been damaged or will be damaged by the acts of NAVFAC.

235.    SLS-FS has no adequate remedy at law to challenge NAVFAC's actions.

236.    The public interest will be served by proper enforcement of the procurement laws.

237.    There is no prejudice to NAVFAC from requiring compliance with the applicable statutes and regulations.

238.    Accordingly, SLS-FS is entitled to injunctive relief preventing NAVFAC from proceeding with the solicitation of proposals under Amendments 6, 7, and 8.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, SLS-FS requests that the Court enter judgment in its favor and against the United States and further requests:

1. An injunction requiring NAVFAC to cancel Amendments 6, 7, and 8 and issue a new amendment to update the RFP in accordance with the Court of Federal Claim's decision in *SLS Fed. Servs., LLC v. United States*, 163 Fed. Cl. 596 (2023);

2. An injunction requiring NAVFAC to take other corrective action as appropriate;

3. A declaratory judgment that NAVFAC's corrective action is arbitrary, capricious, and contrary to law; and

4. An award of attorney's fees, costs, proposal preparation expenses, and any other relief that this Court deems just and proper under the circumstances.

Dated: August 4, 2023

Respectfully submitted,

Of Counsel:
Dean Baxtresser
Julia Lippman                               */s/ Kyle R. Jefcoat*
Genevieve Hoffman                    Kyle R. Jefcoat (Counsel of Record)
W. Allen Perry                            LATHAM & WATKINS LLP
W. Blake Page                            555 11th St. NW
LATHAM & WATKINS LLP      Suite 1000
555 11th St. NW                          Washington, DC 20004
Suite 1000                                   (202) 637-2200
Washington, DC 20004              Fax (202) 637-2201
(202) 637-2200                           kyle.jefcoat@lw.com
(202) 637-2110 dean.baxtresser@lw.com    *Counsel for SLS Federal Services LLC*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was filed electronically via the

CM/ECF system on this 4th day of August 2023.  A true and correct copy was also served by email

to the following parties, this 4th day of August 2023:

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20520
Fax: (202) 305-2062
E-mail: nationalcourts.bidprotest@doj.gov


*/s/ Kyle R. Jefcoat*
Kyle R. Jefcoat